UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

Travis Aldrich,

    Plaintiff,

v.                                              Civil Action No. 2:13-cv-254-jmc

Carolyn W. Colvin, Acting Commissioner
of Social Security Administration,

    Defendant.

## OPINION AND ORDER
(Docs. 11, 16)

      Plaintiff Travis Aldrich brings this action pursuant to 42 U.S.C. § 405(g) of the Social Security Act, requesting review and remand of the decision of the Commissioner of Social Security ("Commissioner") denying his application for disability insurance benefits. Pending before the Court are Aldrich's motion to reverse the Commissioner's decision (Doc. 11), and the Commissioner's motion to affirm the same (Doc. 16). For the reasons stated below, Aldrich's motion (Doc. 11) is DENIED, and the Commissioner's motion (Doc. 16) is GRANTED.

## Background

      Aldrich was 32 years old on his alleged disability onset date of May 20, 2008. He attended school through the eleventh grade and thereafter obtained a GED. He last worked in the spring of 2009 as a bottle clerk and soda manager at a store. He has also worked as a cashier, a custodian, a delivery assistant, and a flagger (directing traffic).

Aldrich had a traumatic childhood, and claims his father murdered his mother when he was two years old. (AR 41, 275, 299.) After his mother's death, his paternal grandparents took custody of him, and he alleges they were physically and emotionally abusive. (AR 41, 275, 300.) Aldrich describes himself as an angry child who regularly got into fights. (AR 275.) He spent time in juvenile detention and lived with a foster family during his teenage years. (AR 276, 300.) He has past legal charges for domestic assault, simple assault, and assaulting a police officer. (AR 300.) In 2011, Aldrich and his fiancé had a son. They were living together in a home along with Aldrich's fiancé's sister and his fiancé's three children who ranged in age from 7 to 11. (AR 34, 42, 305, 326.) On a typical day during the alleged disability period, Aldrich cared for the four children while his fiancé was at work, getting them up and out of bed in the morning, walking the older children to school, playing with his young son when he was not at daycare, and preparing meals. (AR 42–43, 228–29, 419.) In addition, Aldrich did household chores including the dishes and laundry, cared for his pets (three dogs and multiple cats), played computer games, watched television, rested on the couch, and shopped for groceries once a month. (AR 42–43, 46, 228–32.) He was unable to drive because his license had been suspended due to unpaid traffic tickets. (AR 34.)

Aldrich has a history of chronic back and shoulder pain. (AR 304, 419.) When he was 17 years old, Harrington rods were inserted in his back for treatment of congenital

scoliosis,[1] and he was diagnosed with congenital kyphoscoliosis[2] with reported chronic back pain. (AR 305–06, 419.) Aldrich also struggles with mental health problems including posttraumatic stress syndrome ("PTSD") and depression. He has low trust of others, low self-esteem, and anxiety which manifests in frequent anger outbursts. (AR 299–300.) He testified that he is "very scared" in crowds and does not like to go out in public.[3] (AR 41–42.)

In September 2010, Aldrich protectively filed applications for supplemental security income and disability insurance benefits. In the latter application, he alleged that, starting on May 20, 2008, he has been unable to work due to a history of back problems, acid reflux, emotional problems, and restrictive airways. (AR 211.) At the administrative hearing, Aldrich testified that he is in constant discomfort due to his back problems; he is unable to bend over; and he has to take breaks on walks. (AR 37, 47, 49.) Aldrich's application was denied initially and upon reconsideration, and he timely requested an administrative hearing. The hearing was conducted on June 12, 2012 by Administrative Law Judge ("ALJ") Paul Martin. (AR 29–59.) Aldrich appeared and testified, and was represented by an attorney. A vocational expert ("VE") also testified at the hearing. On July 18, 2012, the ALJ issued a decision finding that Aldrich was not

---

[1] Scoliosis refers to "[a]bnormal lateral and rotational curvature of the vertebral column." *Stedman's Medical Dictionary* 1734 (28th ed. 2006).

[2] Kyphoscoliosis refers to "[l]ateral and posterior curvature of the spine." *Stedman's Medical Dictionary* 1036 (28th ed. 2006).

[3] Because the only issue raised in Aldrich's motion relates to a treating physician's opinion regarding Aldrich's *physical* residual functional capacity (*see* Doc. 11 at 11–16), this Opinion and Order focuses on Aldrich's physical, rather than mental, impairments.

disabled from the alleged onset date of May 20, 2008 through the date of the decision. (AR 11–23.) The Appeals Council denied Aldrich's request for review, rendering the ALJ's decision the final decision of the Commissioner. (AR 1–3.) Having exhausted his administrative remedies, Aldrich filed the Complaint in this action on September 16, 2013. (Doc. 3.)

## ALJ Decision

The Commissioner uses a five-step sequential process to evaluate disability claims. *See Butts v. Barnhart*, 388 F.3d 377, 380–81 (2d Cir. 2004). The first step requires the ALJ to determine whether the claimant is presently engaging in "substantial gainful activity." 20 C.F.R. §§ 404.1520(b), 416.920(b). If the claimant is not so engaged, step two requires the ALJ to determine whether the claimant has a "severe impairment." 20 C.F.R. §§ 404.1520(c), 416.920(c). If the ALJ finds that the claimant has a severe impairment, the third step requires the ALJ to make a determination as to whether that impairment "meets or equals" an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("the Listings"). 20 C.F.R. §§ 404.1520(d), 416.920(d). The claimant is presumptively disabled if his or her impairment meets or equals a listed impairment. *Ferraris v. Heckler*, 728 F.2d 582, 584 (2d Cir. 1984).

If the claimant is not presumptively disabled, the ALJ is required to determine the claimant's residual functional capacity ("RFC"), which means the most the claimant can still do despite his or her mental and physical limitations based on all the relevant medical and other evidence in the record. 20 C.F.R. §§ 404.1520(e), 404.1545(a)(1), 416.920(e), 416.945(a)(1). The fourth step requires the ALJ to consider whether the

claimant's RFC precludes the performance of his or her past relevant work. 20 C.F.R. §§ 404.1520(f), 416.920(f). Finally, at the fifth step, the ALJ determines whether the claimant can do "any other work." 20 C.F.R. §§ 404.1520(g), 416.920(g). The claimant bears the burden of proving his or her case at steps one through four, *Butts*, 388 F.3d at 383; and at step five, there is a "limited burden shift to the Commissioner" to "show that there is work in the national economy that the claimant can do," *Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009) (clarifying that the burden shift to the Commissioner at step five is limited, and the Commissioner "need not provide additional evidence of the claimant's [RFC]").

Employing this sequential analysis, ALJ Martin first determined that Aldrich had not engaged in substantial gainful activity since his alleged disability onset date of May 20, 2008. (AR 13.) At step two, the ALJ found that Aldrich had the following severe impairments: scoliosis (status post rod insertion), asthma, PTSD, anti-social personality, and depression. (*Id.*) At step three, the ALJ found that none of Aldrich's impairments, alone or in combination, met or medically equaled a listed impairment. (AR 14–16.) Next, the ALJ determined that Aldrich had the RFC to perform light work, as defined in 20 C.F.R. § 404.1567(b), except as follows:

> [Aldrich] is unable to stand or walk [for] more than 30 minutes at a time, with a break of a few minutes and/or change of position. He is able to occasionally twist, stoop, climb stairs, and balance, but he is unable to climb ladders, ropes[,] and scaffolds[,] or crouch. He must avoid concentrated exposure to environmental irritants, such as fumes, dusts[,] and gases. He must avoid interactions with groups of more than 4-5 people, and may have occasional contact on a routine basis with co[]workers, supervisors[,] and the general public. He is able to perform 1-3[-]step tasks or routine tasks performed on a regular basis.

5

(AR 16.)  Given this RFC, the ALJ found that Aldrich was unable to perform his past relevant work as a bottler (recycler), cashier/bagger, flagger, custodian, inventory clerk, or receiving shipping clerk.  (AR 21.)  Finally, based on testimony from the VE, the ALJ determined that Aldrich could perform other jobs existing in significant numbers in the national economy, including parking lot attendant, basket filler, and bottle label inspector.  (AR 22.)  The ALJ concluded that Aldrich had not been under a disability from the alleged onset date of May 20, 2008 through the date of the decision.  (AR 23.)

## Standard of Review

The Social Security Act defines the term "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  A person will be found disabled only if it is determined that his "impairments are of such severity that he is not only unable to do his previous work[,] but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 423(d)(2)(A).

In considering a Commissioner's disability decision, the court "review[s] the administrative record *de novo* to determine whether there is substantial evidence supporting the . . . decision and whether the Commissioner applied the correct legal standard."  *Machadio v. Apfel*, 276 F.3d 103, 108 (2d Cir. 2002) (citing *Shaw v. Chater*,

221 F.3d 126, 131 (2d Cir. 2000)); *see* 42 U.S.C. § 405(g).  The court's factual review of the Commissioner's decision is thus limited to determining whether "substantial evidence" exists in the record to support such decision.  42 U.S.C. § 405(g); *Rivera v. Sullivan*, 923 F.2d 964, 967 (2d Cir. 1991); *see Alston v. Sullivan*, 904 F.2d 122, 126 (2d Cir. 1990) ("Where there is substantial evidence to support either position, the determination is one to be made by the factfinder.").  "Substantial evidence" is more than a mere scintilla; it means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Poupore*, 566 F.3d at 305.  In its deliberations, the court should bear in mind that the Social Security Act is "a remedial statute to be broadly construed and liberally applied." *Dousewicz v. Harris*, 646 F.2d 771, 773 (2d Cir. 1981).

## Analysis

Aldrich argues that the ALJ erred in his analysis of the opinions of treating physician Dr. Stuart Williams.  Specifically, Aldrich claims that the ALJ should have afforded controlling weight to Dr. Williams's opinions, and that the ALJ failed to provide good reasons for affording limited weight to those opinions.  In response, the Commissioner asserts that Dr. Williams's opinions are not entitled to controlling weight because they are on a matter reserved to the Commissioner.  Moreover, the Commissioner contends that the ALJ properly considered the applicable regulatory factors in his analysis of Dr. Williams's opinions, and that substantial evidence supports the ALJ's conclusion that the opinions are entitled to only limited weight.  The Court finds in favor of the Commissioner, for the reasons explained below.

7

Dr. Williams has been Aldrich's treating primary care physician since 2001, seeing him approximately once every four to six months. (AR 315.) In April 2011, Dr. Williams opined in a RFC questionnaire regarding Aldrich's physical limitations that, because of Aldrich's kyphoscoliosis and chronic back pain, he was capable of sitting for only 15 to 20 minutes and standing for only five minutes at a time, and sitting for about four hours and standing/walking for less than two hours in an eight-hour workday. (AR 318.) Dr. Williams further opined that Aldrich needed a job that would allow him to shift positions at will and take 10- to 15-minute unscheduled breaks approximately every 20 to 30 minutes throughout the day. (*Id.*) Dr. Williams found that Aldrich could frequently lift and carry less than 10 pounds, occasionally lift and carry 10 pounds, never to rarely lift and carry 20 pounds, and never to rarely crouch/squat or climb ladders. (AR 319.) Dr. Williams concluded that Aldrich could not complete a standard 35- to 44-hour work week on a consistent basis but could "perhaps" work for 15 to 20 hours per week "if given [the] flexibility to take required breaks." (AR 320.) Dr. Williams further opined that Aldrich would miss about three or four days of work each month due to his medical conditions or treatment. (*Id.*) Also in April 2011, Dr. Williams stated in a treatment note that Aldrich was "disabled from regular gainful employment" because of progressive back disorder from kyphoscoliosis, Harrington rod placement, progressive degenerative disease of the spine, and disabling pain. (AR 326.) In May 2012, Dr. Williams indicated that his assessment of Aldrich's physical RFC had not changed. (AR 417.)

The ALJ was required to analyze Dr. Williams's opinions under the treating physician rule, given his status as Aldrich's treating primary care physician during the

8

relevant period. Under that rule, a treating physician's opinion on the nature and severity of a claimant's condition is entitled to "controlling weight" if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record." 20 C.F.R. § 404.1527(c)(2); *see Schisler v. Sullivan*, 3 F.3d 563, 567–69 (2d Cir. 1993). The deference given to a treating physician's opinion may be reduced, however, in consideration of other factors, including the length and nature of the physician's relationship with the claimant, the extent to which the medical evidence supports the physician's opinion, whether the physician is a specialist, the consistency of the opinion with the rest of the medical record, 20 C.F.R. § 404.1527(c)(2)–(5), and any other factors "which tend to . . . contradict the opinion," *id.* at (c)(6). *See Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004). Moreover, if the ALJ gives less than controlling weight to a treating physician's opinion, he must provide "good reasons" in support of that decision. *Burgess v. Astrue*, 537 F.3d 117, 129 (2d Cir. 2008) (internal quotation marks omitted).

The ALJ complied with the treating physician rule in his analysis of Dr. Williams's opinions and gave good reasons in support of his decision to afford "limited weight" to those opinions. (AR 21.) First, the ALJ found that Dr. Williams's opinions are conclusory, failing to include "much diagnostic or clinical evidence . . . to support the limitations noted [therein]." (*Id.*) The evidence supports this finding. In response to a question in Dr. Williams's RFC questionnaire inquiring about what "clinical findings and objective signs" supported his opinions, Dr. Williams wrote merely: "multiple [illegible], tense para-spinous muscles." (AR 315.) Moreover, Dr. Williams stated in the

9

questionnaire that the basis for his opinion that Aldrich could perhaps work 15 to 20 hours per week is: "[Aldrich's] reported functional capacity." (AR 320.) In other words, the basis for this important portion of Dr. Williams's opinions is Aldrich's own subjective reporting about his limitations. But the ALJ was "not required to accept [Aldrich's] subjective complaints without question"; he had discretion to weigh the credibility of Aldrich's testimony "in light of the other evidence in the record." *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010). The ALJ found that Aldrich's statements about the intensity, persistence, and limiting effects of his symptoms were not entirely credible (AR 17), and Aldrich does not dispute that finding. While another fact-finder could view the evidence in a light more favorable to Aldrich, the court may not substitute its own credibility determination for that of the ALJ's unless the latter was "patently unreasonable," *Pietrunti v. Dir., Office of Workers' Comp. Programs*, 119 F.3d 1035, 1042 (2d Cir. 1997), not the case here.

    Aldrich cites to Dr. Williams's treatment note which was prepared on the same date of Dr. Williams's RFC questionnaire (April 28, 2011) in support of his argument that Dr. Williams's opinions were entitled to controlling weight. (*See* Doc. 11 at 14 (citing AR 326).) But the "objective" portion of that note states merely that Dr. Williams observed that Aldrich had "[m]ultiple incisions, tense and somewhat tender parathoracic and lumbar muscles[,] [and] fairly good range of motion [in the] shoulders, elbows, knees, [and] hips." (AR 326.) Also noteworthy, the April 28, 2011 treatment note indicates that 25 minutes of Aldrich's 30-minute appointment with Dr. Williams consisted of "face-to-face counseling and review of disability forms." (AR 326–27.)

Moreover, the note indicates that Dr. Williams did not find it necessary to see Aldrich again until another "6 months." (AR 327.) This treatment note does not support the significant walking, standing, sitting, lifting, and carrying limitations contained in Dr. Williams's RFC questionnaire.

Second, the ALJ found that Dr. Williams's opinions were entitled to only limited weight because they are "inconsistent with his own medical exam notes, which show generally good range of motion in [Aldrich's] shoulders with only some tenderness in his back." (AR 21.) It was proper for the ALJ to consider the consistency of Dr. Williams's opinions with the rest of the record, including his own treatment notes. *See Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004) ("the opinion of the treating physician is not afforded controlling weight where . . . the treating physician issued opinions that are not consistent with other substantial evidence in the record"). Moreover, substantial evidence supports the ALJ's finding. For example, in the "objective" portion of Dr. Williams's January 13, 2010 treatment note, he stated that Aldrich had "[g]ood range of motion in [his] shoulders and elbows" and his spinal kyphosis was "stable." (AR 284.) And in the "objective" portion of an August 29, 2011 treatment note, Dr. Williams stated that Aldrich had "[f]airly good range of motion" in his shoulders; "[g]ood range of motion" in his elbows, knees, and hips; and only "slight[ly] tender" posterior cervical and upper paraspinous muscles. (AR 358.) Although Dr. Williams's April 28, 2011 treatment note, discussed above, states that Aldrich had "chronic back pain" and "constant pain around the shoulder blades," and was "extremely limited" in his daily activities, these recordings were part of the "subjective" portion of the treatment note,

11

indicating they were based on Aldrich's subjective reporting, not objective findings based on examination. (AR 326.)

The ALJ noted that Dr. Williams's records indicate that physical therapy ("PT") "has been helpful in alleviating [Aldrich's] pain." (AR 21.) This finding is also supported by substantial evidence. A June 28, 2011 treatment note from Dr. Williams states that Aldrich had been doing PT "on and off with improvement for 6 months or so," and that he was "[d]oing better with standing tolerance, [was] able to hold the baby easier, [and had a] stronger core." (AR 353.) The note also states that Aldrich was independent in self-care, caregiving, and walking; his back felt "okay"; and he "[w]as able to go on [a] longer walk yesterday, more than he's done in a[ ]while." (*Id.*) Dr. Williams stated that overall there was "some improvement in function," and Aldrich was "[d]oing chores and activities at home," although he still had bouts of pain in his back which limited him functionally. (*Id.*) In the "Assessment/Diagnosis" portion of this treatment note, Dr. Williams stated that Aldrich "has made good progress with [PT], [and was] feeling better, stronger, and [was] able to tolerate more activity." (AR 355.)

In the August 2011 treatment note discussed above, Dr. Williams stated that, although PT had been helping Aldrich and Aldrich was "doing well," he had stopped going to PT "because of [his] busy family schedule." (AR 358.) After returning to PT sometime soon thereafter, Aldrich was again doing better. In an October 13, 2011 treatment note, PT Amy Partin stated that Aldrich's rehabilitation potential was "[g]ood." (AR 390.) An October 19, 2011 treatment note from Partin states: "Patient Report: 'I'm a little bit better.' 'It's been hard to do the exercises because I've been so busy.' 'I'm

12

definitely better than when I first came in.'"  (AR 393.)  Partin further states: "Pain not noted today" (*id.*), and: "Patient . . . reports improved pain[-]free function with [activities of daily living].  Patient does continue to report low back and left shoulder pain with resisted [upper extremity] activities and with bending and lifting . . . , but anticipate this to improve with continued compliance to both land and aquatic programs" (AR 394). Aldrich's PT services were discontinued on that date because his "[g]oals ha[d] been MET" and there was no longer a need for "skilled therapy intervention."  (*Id.*)  Thus, the ALJ was correct in noting that Dr. Williams's opinions were inconsistent with PT notes. The ALJ also was correct in noting that muscle relaxant and pain medications were helpful in treating Aldrich's pain.  (*See, e.g.*, AR 358 ("[h]e does get some relief from tramadol 50 mg up to 4 times daily and chlorzoxazone 500 mg 4 times daily"); 368 ("new pain medication . . . seems to have helped") (internal quotation marks omitted).)

      The ALJ's third and final reason for affording limited weight to Dr. Williams's opinions is that these opinions are "inconsistent with [Aldrich's] own testimony and reported activities of daily living." (AR 21.)  The ALJ explained that Aldrich had reported he could lift up to 25 pounds, walk up to a couple of miles each day (with a rest break), and perform other household chores.  (*Id.*)  In determining what weight to afford to Dr. Williams's opinions, it was proper for the ALJ to consider both the consistency of the opinions with other evidence in the record, *see* 20 C.F.R. § 404.1527(c)(4) ("the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion"), and Aldrich's daily activities, *see* 20 C.F.R. § 404.1529(c)(3) (a claimant's "pattern of daily living" is "an important indicator of the intensity and persistence of [the

13

claimant's] symptoms"). Moreover, substantial evidence supports the ALJ's findings on these issues. As noted in the ALJ's decision (AR 15, 18–19), Aldrich "has been able to carry on a fairly active lifestyle" (AR 18), performing household chores (with breaks) on a daily basis, going grocery shopping, preparing meals for his family, caring for multiple pets, and taking care of four young children, including walking them approximately one mile to school each day[4]. (AR 41–43, 45–46, 228–33.) A therapy note from June 2009 indicates that Aldrich described himself as "the stay at home Dad," never having time for himself. (AR 275.) On various dates, Aldrich reported to his medical providers that he cleared snow, raked his lawn, cleaned and worked around the house, held his baby son for feedings, changed his son's diapers, built and repaired kitchen shelves, ran errands, installed a new door, and worked on his washer. (AR 284, 326, 351, 353, 378, 381, 387, 390.)

More specifically, a January 2010 treatment note from Dr. Williams states that Aldrich was injured while "clearing snow on Christmas Eve." (AR 284.) An April 2011 treatment note from Dr. Williams indicates that Aldrich was doing housework such as light cleaning or washing dishes for 15 to 20 minutes at a time and raked his lawn for 15 minutes at a time. (AR 326.) A September 2011 treatment note from PT Lorelei Wyman states that Aldrich "did do a lot of cleaning yesterday" and was improving in his ability to put away dishes and groceries without pain exacerbation. (AR 378.) An October 4, 2011 treatment note from PT Partin states: "Patient Report: 'I have been feeling better[,] but

---

[4] At the administrative hearing, Aldrich testified that he could walk for about one-quarter of a mile on a flat surface without a break. (AR 40.)

14

then I did too much over the weekend.' [Aldrich] reports increased left shoulder pain attributed to building and repairing kitchen shelves over the weekend." (AR 381.) An October 12, 2011 treatment note from Partin states: "[Aldrich] reports he is very sore today, both in his back and left shoulder, due to increased activity over the weekend. He states that he put in a new door which caused him to perform some bending and lifting. He also worked on his washer which involved kneeling." (AR 387.) Finally, an October 13, 2011 treatment note from Partin states: "Patient reports . . . , 'I've been really busy running errands.'" (AR 390.) The ALJ reasonably found that Aldrich's ability to do these activities does not support the functional limitations assessed by Dr. Williams.

Having found a lack of evidence to support Dr. Williams's opinions, the ALJ was entitled to rely on the opinions of other physicians in the record, including those of examining consultant Dr. Roger Kellogg (AR 305–07) and nonexamining state agency consultant Dr. Geoffrey Knisely (AR 97–99). Aldrich argues that Dr. Knisely's opinions deserves less weight because Dr. Knisely did not examine Aldrich and made inconsistent and conclusory findings. Based on his review of the record—including Dr. Williams's treatment notes and opinions, PT notes, and Dr. Kellogg's consultative examination report—Dr. Knisely opined in an assessment of Aldrich's physical RFC that Aldrich could lift and carry 20 pounds occasionally and 10 pounds frequently, stand and/or walk for about six hours in an eight-hour workday, and sit for about six hours in an eight-hour workday, but would need to alternate between sitting and standing for three to five minutes every hour to relieve pain and discomfort. (AR 97–98.) Dr. Knisely further opined that Aldrich could never climb ladders, ropes, or scaffolds and only occasionally

stoop and crouch.  (AR 98.)  Regarding Dr. Williams's April 2011 assessment of Aldrich's physical RFC, Dr. Knisely stated that the opinion "relies heavily on the subjective report of symptoms and limitations provided by [Aldrich], and the totality of the evidence does not support the opinion."  (AR 115.)  Moreover, Dr. Knisely noted that Dr. Williams's opinion "contrasts sharply with the other evidence in the record, which renders it less persuasive."  (*Id.*)  As discussed above, substantial evidence supports Dr. Knisely's conclusions.  Therefore, it was proper for the ALJ to give significant weight to Dr. Knisely's opinions.  *See Diaz v. Shalala*, 59 F.3d 307, 313 n.5 (2d Cir. 1995) (citing *Schisler v. Sullivan*, 3 F.3d 567–68 (2d Cir. 1993)) ("[T]he regulations . . . permit the opinions of nonexamining sources to override treating sources' opinions provided they are supported by evidence in the record."); SSR 96-6p, 1996 WL 374180, at *3 (July 2, 1996) ("In appropriate circumstances, opinions from State agency . . . consultants . . . may be entitled to greater weight than the opinions of treating or examining sources.").

For these reasons, the Court finds that the ALJ did not err in his analysis of Dr. Williams's opinions.

## Conclusion

The Court DENIES Aldrich's motion (Doc. 11), GRANTS the Commissioner's motion (Doc. 16), and AFFIRMS the decision of the Commissioner.

Dated at Burlington, in the District of Vermont, this 31st day of October, 2014.

/s/ John M. Conroy
John M. Conroy
United States Magistrate Judge